Virgil VAN BIBBER, The Van Bibber Lakeside Retreat, Inc., and American Fletcher National Bank and Trust Company, Appellants (Defendants Below),

v.

William C. NORRIS, Appellee (Plaintiff Below).

No. 2–376A91.

Court of Appeals of Indiana, Fourth District.

June 3, 1980.

Rehearing Denied Aug. 25, 1980.

Terrill D. Albright and James M. Carr, Baker & Daniels, Indianapolis, for American Fletcher Nat. Bank & Trust Co.

Glenn E. Davis, Sr., Davis & Davis, Indianapolis, for Virgil Van Bibber, et al.

Robert J. Hoffman, Hugh G. Baker, Jr., Steven D. Allen, Indianapolis, for appellee.

YOUNG, Judge.

This cause was distributed to the Fourth District November 16, 1979.

William Norris brought this action to recover damages for the loss of his mobile home and its contents. He sued American Fletcher Nat'l Bank & Trust Co., Virgil Van Bibber, and the Van Bibber Lakeside Retreat, Inc.[1] The trial court awarded against all defendants damages of $5,000 for the home and $10,000 for the contents. Van Bibber was given a set-off of $1,837.41 for sums owed by Norris to Van Bibber. Norris also recovered punitive damages of $10,000 against the bank and $30,000 against Van Bibber. We affirm.

Our statement of the facts is taken largely from the bank's brief. Where the evidence or inferences are in conflict we will accept that version which is favorable to the judgment. *Kroger Co. v. Beck,* (1978) Ind.App., 375 N.E.2d 640, 643.

Norris purchased a mobile home from Van Bibber in 1965. The total time balance of this purchase was $5,738.04. This amount included the finance charge and insurance expenses. Norris agreed to pay the balance in 84 monthly instalments of $68.31. These fell due on the thirtieth day of each month. The contract between Van Bibber and Norris was on a form prepared by the bank. It was entitled "retail instalment sale security agreement." Van Bibber assigned the contract to the bank on a full repurchase basis.

The contract contained the following provision:

"Upon the occurrence of any of the following events or conditions, namely: (i) default in the payment or performance of any of the obligations of the Buyer or of any covenant or liability contained or referred to herein; (ii) any warranty, representation or statement made or furnished to the Seller by or on behalf of the Buyer in connection with this Agreement proving to have been false in any material respect when made or furnished; (iii) loss, theft, substantial damage, destruction, sale or encumbrance to or of any of the Goods, or the making of any levy, seizure or attachment thereof or thereon; (iv) death, dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding under, any bankruptcy or insolvency laws by or against the Buyer or any guarantor or surety for the Buyer; or (v) the Seller, for any reason deeming itself insecure, the Seller may at its option without notice or demand declare all of the Buyer's obligations to be immediately due and payable and shall then have the remedies of a secured party under the Uniform Commercial Code as enacted in Indiana (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted), including without limitation thereof, the right to take possession of the Goods, and for that purpose the Seller may, so far as the Buyer can give authority therefor, enter upon any premises on which the Goods or any part thereof may be situated and remove the same therefrom. The

1. Unless otherwise noted, Virgil Van Bibber and the Van Bibber Lakeside Retreat, Inc., will be referred to interchangeably as Van Bibber.

Seller may require the Buyer to make the goods available to the Seller at a place to be designated by the Seller which is reasonably convenient to both parties. Unless the Goods are perishable or threaten to decline speedily in value or are of a type customarily sold on a recognized market, the Seller shall give the Buyer at least ten (10) days' prior written notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. Expenses of retaking, holding, preparing for sale, selling or the like shall include the Seller's reasonable attorneys' fees and legal expenses."

The repurchase obligation of Van Bibber was contained in the following language: "This assignment is made:

" . . .

"4) on a FULL REPURCHASE basis whereby Dealer agrees to purchase the Goods from the Bank for the unpaid balance due under the terms of the Agreement if the Goods are repossessed by the Bank and offered to the Dealer within 90 days after maturity of the earliest instalment remaining unpaid, or if the Bank is required by law or by the order of any court or governmental agency to hold said Goods for any reason, the Dealer will accept delivery of the Goods as soon as they can be delivered, notwithstanding the fact that delivery may be delayed for such reason beyond the 90-day period mentioned above, and the Dealer will so purchase the Goods although the Bank has, prior thereto, and without Dealer's consent waived default by the Buyer in the performance of the Agreement or has granted an extension of time to the Buyer in which to perform, or has taken possession of Goods."

Very often Norris was late with his monthly payments. The bank's employee, John Runk, testified that out of fifty-nine payments Norris was past due (five days late) fifty-seven times. Thirty-seven times the account was delinquent (over ten days late). The bank would press him for the payments. Eventually Norris would make them. Sometimes his mother made the payments for him. The bank's brief also informs us that on seventeen occasions instalments were more than thirty days overdue. The bank twice extended the maturity date.

Norris initially kept the mobile home at a trailer park operated by Van Bibber. Animosity developed between Norris and Van Bibber. Norris eventually removed his mobile home from Van Bibber's trailer park. By this time Norris was allegedly indebted to Van Bibber for about $400.00. This debt was evidenced by a promissory note.

Upon leaving the Van Bibber trailer park Norris moved his mobile home to a park operated by Imperial Estates. Norris became indebted to Imperial Estates.

An instalment on the bank loan fell due October 30, 1970. Norris did not pay the instalment by that date. According to Runk's testimony the bank would not consider a payment delinquent until "over ten days past the payment date." The tenth day was November 9.

On November 6, 1970, Imperial Estates filed a "Complaint for Rent and Restraining Order" against Norris. The purpose of this was to recover delinquent rent and various penalties. Imperial Estates also prayed the court to order Norris not to remove his mobile home from the trailer park. The Montgomery Circuit Court issued the order the same day.

Norris tried to remove his mobile home secretly from Imperial Estates on the night of November 7–8. His friend Ronnie Van Bibber, the son of defendant Van Bibber, assisted him in this attempt. Norris planned to tow the trailer with a truck belonging to defendant Van Bibber. The removal attempt was thwarted when Norris was served with the restraining order.

November 8 was a Sunday. That evening law officers arrested and incarcerated Norris and Ronnie Van Bibber in Indianapolis on a drug charge. The elder Van Bibber was not immediately aware of this.

The next morning, November 9, Van Bibber called John Runk of the bank. Van Bibber first asked whether the account of Norris was current. Runk "advised him that it was at that time." (This was consistent with his testimony that the bank would not consider the account delinquent until ten days after October 30, and November 9 was the tenth day.) After receiving this response from Runk, Van Bibber then told him about the weekend incident at Imperial Estates.

Following this conversation Runk discovered in a local newspaper that Norris had been arrested the night before. Runk conferred with his superior, James McAllister, about the matter. They decided to repossess the trailer even though Norris was current on his account.

That same morning Runk called Van Bibber to tell him of the bank's decision to repossess. During this conversation Runk informed Van Bibber of the arrest of Norris. At the same time Runk discovered that the newspaper article also recounted the arrest of Ronnie Van Bibber. This was the first information that Van Bibber had received of his son's arrest.

On November 9 the bank requested Van Bibber to repossess the mobile home. Van Bibber did this on November 20 after the bank agreed to pay the claim of Imperial Estates against Norris. Van Bibber removed the mobile home from Imperial Estates to Van Bibber's trailer park the same day.

On November 25, 1970, the bank mailed to Norris written notice of the repossession. The bank sent the notice to the former address of Norris at Imperial Estates. The bank gave the notice pursuant to a provision of the bank's insurance coverage.

Norris, meanwhile, resided in the Marion County Jail from November 9 through the 23rd. From November 24 through December 11 he was in the Crawfordsville jail. It was not until December 11 that Norris was able to obtain release on bail.

Tom Madden, a relative of Norris, contacted the bank on December 2. He asked how the trailer could be reacquired by Norris. Runk informed Madden that it would be necessary to pay the full amount owing on the contract, the amount reimbursed to Imperial Estates, and the costs of the repossession. Madden pursued nothing further along this line.

On December 14 the bank received a check from Van Bibber for the repurchase of the home.

After his release from jail Norris contacted Van Bibber. Van Bibber refused to return the mobile home or its contents unless Norris first paid him $2,580.11. This amount apparently included the balance due on the purchase price together with other claims such as delinquent rent. Norris did not pay this amount. Therefore Van Bibber retained the mobile home and contents.

Van Bibber stored some of the trailer's contents in a warehouse. These were subsequently destroyed by a fire. Van Bibber removed from the trailer and gave to his children a television and a stereo belonging to Norris. Eventually Van Bibber sold the mobile home. The specific circumstances of the sale are not in the record.

Trial was to the court. The judge entered findings and conclusions.

■■■ We could draw many issues from this summary of the facts. However we keep in mind the rule that we must limit our review of the merits to an examination only of the particular issues raised by the appellants. *Morgan Cnty. R. E. M. Corp. v. Public Service Co. of Ind.*, (1970) 253 Ind. 541, 255 N.E.2d 822, 826. This case comes to us with the presumption that the trial court reached the correct result. *Souerdike v. State*, (1952) 231 Ind. 204, 108 N.E.2d 136, 137. We first address the bank's arguments concerning liability. Following that we will discuss Van Bibber's liability and the awards of punitive and compensatory damages.

## I.

The bank argues the court erred by finding a conspiracy between the bank and Van

Bibber. The bank loses this argument for two reasons. First, the trial court never made any finding of conspiracy. Second, even were such finding present, the bank has offered no explanation as to how the alleged finding affected to any degree the liability of the bank.

With respect to the first reason, our examination of the judgment fails to disclose that the court ever used the word "conspiracy." The bank asserts that the notion of conspiracy "runs through" almost all the findings. We are not persuaded that the language employed by the judge is of such force as to represent a "finding" of conspiracy.

 More importantly the bank offers no explanation how any such alleged finding affected the bank's liability. After pressing hard that such a finding is present the bank abruptly drops the matter and turns to other issues. We have been given no argument or authority that the alleged finding in any fashion amounts to reversible error. Assuming that a finding of conspiracy was made, and that the finding was wrong, this does not entitle the bank to reversal absent some showing or explanation of the manner in which the finding contributed to an erroneous judgment. *De-Mayo v. State ex rel. Department of Natural Resources*, (1979) Ind.App., 394 N.E.2d 258, 261; *Daly v. Nau*, (1975) 167 Ind.App. 541, 339 N.E.2d 71, 81; *Registration & Management Corp. v. City of Hammond*, (1972) 151 Ind.App. 471, 280 N.E.2d 327, 331. We as an appellate court will not hypothesize arguments for overthrowing the judgment. The bank's task was to present us with cogent reasons for finding reversible error. The bank not having done so, we find no reversible error with respect to this issue.

## II.

The bank argues that its decision to accelerate the debt and repossess was supported by three separate bases under the contract and the Uniform Commercial Code. Ind. Code, Title 26. Our review of this argument begins with the concept of default. The UCC does not define "default." This term is defined in the contract. 69 Am. Jur.2d *Secured Transactions* § 553 (1973). The pertinent language from the contract was set out in an earlier portion of this opinion. We will take up the bank's three arguments in the order presented in the brief.

### A.

The bank first argues that the missed instalment of October 30, 1970, was a default which could serve as a basis for the acceleration and repossession. *See* item (i) of the default provisions, *supra*. At the outset we observe that this argument is severely undercut if not demolished by Runk's testimony, discussed *supra*, that on the day the bank decided to repossess, November 9, Runk had informed Van Bibber that the account of Norris was current. Runk's comment was borne out by evidence disclosing that the bank did not consider an account delinquent unless ten days overdue. In addition there are at least two additional hurdles which the bank must, but failed, to clear in order to prevail with this argument. First, the bank failed to establish *in fact* that at the time the decision to repossess was made, the bank relied upon this alleged[2] delinquency in reaching the decision to repossess. Second, the bank failed to establish that it had not waived timely payments by its past practice of accepting at least thirty-seven delinquent payments.

 Did the bank *in fact* rely upon the alleged delinquent payment of October 30? The purpose of our inquiry is simple. In order to give the bank the advantage of its contention that the bank was entitled to accelerate because of the delinquent payment, we must determine whether, at the time the bank decided to accelerate, its decision was based at least in part upon the

---

**2.** We refer to this as an "alleged " delinquency because the bank's own evidence which is also evidence favorable to the judgment, reveals that as of November 9 the account was not yet delinquent. The bank's internal policy was that a delinquent payment was one "over ten days past the payment date."

alleged delinquent payment. Absent such reliance, the bank's decision to accelerate and repossess falls short of the "general requirement of fundamental integrity in commercial transactions regulated by the Code." *Skeels v. Universal C.I.T. Credit Corp.*, (3rd Cir. 1964) 335 F.2d 846, 851; *see Central Soya Co. v. Bundrick*, (1975) 137 Ga.App. 63, 222 S.E.2d 852, 855 ("Principles of estoppel and good faith underlie the entire Uniform Commercial Code, including the provisions of Article 9").[3] Certainly it does not overtax the notion of good faith to conclude that a decision to accelerate and repossess due to an alleged delinquent payment can be upheld only if the decision was in fact made for that reason. "Good faith" requires at a minimum that a party justify its action upon the information then known to it when the action was taken.

We examine the bank's brief. Nowhere in its argument of this issue does the bank present any contention that *in fact* it relied upon the alleged delinquency. The obvious reason is that by the bank's definition the account was not delinquent. There is no citation to the record to support the bank's argument.[4] The bank fails to show reversible error.

For a second reason the bank fails to justify its decision to repossess on account of the alleged delinquent payment. The trial court found that many times the bank accepted late payments. This finding supports the court's decision that the bank had waived timely payment. The conclusion of waiver was justified by the Supreme Court's decision in *Skendzel v. Marshall*, (1973) 261 Ind. 226, 301 N.E.2d 641, 643–44, a land contract case. The same principle applies to sales of personalty. *Farm Bur. Mut. Ins. Co. of Ind. v. Emmons* (1952) 122 Ind.App. 440, 104 N.E.2d 413, 416; *Snyder v. International Harvester Credit Corp.*, (1970) 147 Ind.App. 364, 261 N.E.2d 71; IC 26–1–9–503, Indiana Comment. "[T]he secured party may not ordinarily establish a pattern of accepting time payments which may be slightly late and then suddenly insist on strict compliance with time provisions and declare a forfeiture; in such case, where the parties have treated the time clause as waived with respect to some payments, the secured party, in order to avail himself of the right of forfeiture for failure to make subsequent payments on time, must give reasonable, definite and specific notice of his changed intention." 79 C.J.S. Supp. *Secured Transactions* § 100 (1974). The bank does *not* argue on this appeal that it gave "reasonable, definite and specific" notice that it would hold Norris to strict compliance with the time provisions. Although the bank apparently warned Norris on several occasions to make the payments on time, no portion of the bank's appellate argument is devoted to any contention that, after fifty-seven past due payments and thirty-seven delinquencies, the bank would now hold Norris to strict compliance.

---

3. The bank argues that "good faith" is not relevant to a bank's decision to accelerate and repossess on account of a delinquent payment or on account of "impoundment" of the trailer (see issue II B *infra*). The bank cites *Cox v. Galigher Motor Sales Co.*, (1975) W.Va., 213 S.E.2d 475, 479. This case goes no farther than to say that *after* the decision to repossess is made, the use of deceit to carry out that decision does not vitiate the repossession. By contrast, in the case at bar we are trying to determine whether in the first instance the bank justifiably arrived at the decision to repossess. *Cox v. Galigher Motor Sales Co.* does not concern the issue before us. The obligation of good faith is found in IC 26–1–1–203. This obligation is made applicable to Article 9 by virtue of IC 26–1–9–105(4). Accordingly we reject outright the contention that good faith is not relevant to the bank's decision to accelerate

and repossess on account of a delinquent payment or on account of "impoundment" of the trailer. "The provisions of Article 1 of the Code, including the duty to act in good faith, together with the principles of common law and equity remain applicable to Article 9 transactions unless 'displaced' by the specific rules of the article." 1 *Bender's UCC Service* § 5A.01 (1979).

4. The bank's "Statement of the Relevant Facts," brief 21, says that the bank's decision to repossess was based in part upon the delinquent instalment of October 30, 1970. The bank's citation to the record, Record 606, does not support this. Cf. fn. 6, *infra* (referring to the "past payment record" but not referring to any alleged "delinquency" of the most recent instalment).

■ The bank does, however, argue that a finding of waiver is precluded by certain language in the security agreement. This language states that "[n]o waiver by the Seller [the bank [5]] of any default shall be effective unless in writing, nor operate as a waiver of any other default nor of the same default on a future occasion." We do not believe this language is strong enough to override the Supreme Court's holding in *Skendzel v. Marshall, supra,* that " 'the vendor may waive strict compliance with the provisions of the contract by accepting overdue or irregular payments, and having so done, equity requires the vendor give specific notice of his intent that he will no longer be indulgent and that he will insist on his right of forfeiture unless the default is paid within a reasonable and specified time.' " 301 N.E.2d 643–44. In 1A *Bender's UCC Service* § 8.02[1] (1979), the statement is made that a "non-waiver clause will not necessarily protect the secured party from the assertion of waiver," citing *inter alia, Fontaine v. Industrial Nat'l Bank of Rhode Island,* (1973) 111 R.I. 6, 298 A.2d 521.

The case law from other states concerning the non-waiver clause is split. The bank cites cases such as *Fair v. General Fin. Corp. of Georgia,* (1978) 147 Ga.App. 706, 250 S.E.2d 9 [*disapproved* in *Smith v. General Fin. Corp. of Georgia,* (1979) 243 Ga. 500, 255 S.E.2d 14], and *General Grocer Co. of Ill. v. Bachar,* (1977) 51 Ill.App.3d 907, 8 Ill.Dec. 720, 365 N.E.2d 1106. In light of the unequivocal language of *Skendzel v. Marshall* we are not permitted to follow the above two cases. To decide otherwise would be to revert to days gone by when a secured party could mislead a debtor into believing that an untimely payment would be excused—keeping in mind that the bank in this case had put up with thirty-seven delinquencies and fifty-seven past due payments—and then without forewarning accelerate and repossess on the next occasion. If ever waiver is established it certainly was established by then.

A view consistent with *Skendzel v. Marshall* was adopted in *Fontaine v. Industrial Nat'l Bank of Rhode Island,* (1973) 111 R.I. 6, 298 A.2d 521, *supra.* The Supreme Court of Rhode Island held that it would be unconscionable to give effect to non-waiver language and thereby place the debtor in "constant peril" of repossession notwithstanding the bank's former practice of accepting late payment.

Accordingly the bank's conduct in accepting fifty-seven past due payments and thirty-seven delinquent payments spoke louder than its word. The trial court was adequately justified to conclude that the bank had waived timely payments.

### B.

■ The bank argues that the "impoundment" of the trailer by the Montgomery Circuit Court was a proper basis for default. *See* item (iii) of the default provisions, *supra.* There never was any "impoundment." The action of the Montgomery Circuit Court, insofar as this issue is concerned, was limited to issuing a restraining order. This order forbade Norris from moving his trailer out of Imperial Estates "until further order of this court." Thus the bank errs to classify the court's action as "impoundment." The purpose of a restraining order is simply to maintain the status quo. 43 C.J.S. *Injunctions* § 10 (1978); Black's Law Dictionary 1247 (4th ed. rev. 1968). "Maintenance of the status quo" obviously does not fall within item (iii) of the default provisions, which refers to a "loss, theft, substantial damage, destruction, sale or encumbrance to or of any of the Goods, or the making of any levy, seizure or attachment thereof or thereon." We also note that the bank fails to cite any case law either under the UCC or prior law to support a conclusion that a court-ordered maintenance of the status quo falls within this quoted language.

■ In connection with this argument of "impoundment," the bank asserts that the legal action brought by Imperial Es-

---

5. The security agreement defines "Seller" to include the bank, as assignee of Van Bibber.

tates was an attempt to enforce the latter's mobile homekeeper's lien. *See* IC 13–1–7–33 [IC 16–9–2B–33]; 32–8–27–2. The bank has labeled the commencement of this legal action as the attachment of a superior lien. See IC 26–1–9–310; Annot., 30 A.L.R.3d 9, 89–92 (1970). The bank argues that this development constituted a default under item (iii) of the default provisions.

This argument has many defects. Therefore the trial court reasonably rejected it. First, the pleadings filed by Imperial Estates make no mention of the word "lien." There is no language in the pleadings to indicate that Imperial Estates was attempting to enforce its lien. The pleadings do not cite the pertinent statutes. We reiterate that the immediate impact of the relief sought by Imperial Estates, insofar as it may have any bearing upon the decision to repossess, was simply to maintain the status quo.

■ Second, no authority is given for the bank's position other than a general reference to *Nicholson's Mobile Home Sales, Inc. v. Schramm*, (1975) 164 Ind.App. 598, 330 N.E.2d 785. The bank has presented us with no authority that the filing of a lawsuit against the debtor Norris entitles the bank *ipso facto* to repossess. This waives the bank's alleged error. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7); *In re Kesler*, (1979) Ind., 397 N.E.2d 574, 576; *Kennedy v. State*, (1979) Ind., 393 N.E.2d 139, 143; *Faught v. State*, (1979) Ind., 390 N.E.2d 1001, 1016; *Moten v. State*, (1978) Ind., 380 N.E.2d 544, 547. The bank's inability to locate precedent suggests that its argument has no merit. *Johnson v. State*, (1980) Ind., 399 N.E.2d 360, 363.

■ Third, the record fails to disclose that the bank relied upon the alleged imposition of the "lien" in reaching the decision to repossess. The bank claims that Van Bibber informed Runk of the "lien" on November 9. The bank cites record 815, 818, & 605 to support this. At record 815 the only passage connected to this issue is that Van Bibber testified he believed he told the bank of the "impoundment" (to use his term). We do not find Record 818 is on

point. At Record 605 there is deposition evidence by Runk in which he acknowledged that on November 9 Van Bibber had telephoned him to mention the impoundment. This is sufficient to justify a conclusion that the bank's argument about a "lien" appears to be but an attempt to justify retroactively the decision to repossess upon a ground of dubious existence.

■ Fourth, even assuming that Imperial Estates was in fact asserting a lien, and assuming further that the bank was in fact aware of this on November 9, was this sufficient *ipso facto* to justify the decision to repossess? There is absolutely no evidence that the bank had verified the amount of damages claimed by Imperial Estates. Runk testified in deposition that only after the decision to repossess had been made did he telephone Imperial Estates to verify the amount due from Norris to Imperial Estates. There is no evidence that the bank attempted to inform itself whether the allegations of Imperial Estates' complaint were colorably valid. We do not believe that the bank can claim it decided in good faith to repossess based upon untested allegations seeking an unknown amount of damages.

For all these reasons there is sufficient evidence for the trial court reasonably to conclude that the alleged "impoundment" did not justify the repossession.

### C.

The bank argues that the acceleration and repossession were justified by the bank's good faith belief that the debt was insecure. *See* item (v) of the contract language, *supra*.

The insecurity clause justifies the bank's acceleration only if the bank "in good faith believes that the prospect of payment or performance is impaired." IC 26–1–1–208. Norris had the burden to prove lack of good faith. IC 26–1–1–208.

#### (i)

■ The bank first argues that the prospect of performance was impaired.

The bank asserts that the impairment arose when Norris permitted the lien of Imperial Estates to attach. We noted in an earlier portion of this opinion that a trial judge would be justified in disbelieving the bank's argument about the "lien". This disbelief could reasonably result from the circumstance that nothing in Imperial Estates' pleading made mention of a lien. Also, the record does not disclose that the bank bothered to inquire, before it decided to accelerate and repossess, about the amount allegedly due to Imperial Estates. The record discloses that Runk obtained this information afterwards. The bank did not attempt to discover whether any of the allegations in Imperial Estates' pleading had potential merit. The trial court reasonably could and did find a lack of good faith due to these circumstances.

The bank argues that the prospect of performance was impaired when Norris tried to remove the trailer from Imperial Estates without possessing the requisite permit. *See* IC 9–8–1–7. This lack of a permit, contends the bank, contravened that portion of the security agreement which obligated Norris not to use "the Goods in violation of any applicable statute . . . ." The bank, however, conceived this argument in hindsight. This is because there is no indication that the bank relied upon this alleged statutory violation when it made the decision to accelerate and repossess. The bank, brief 52, says it knew on November 9, 1970, that Norris was not performing obligations under the contract," yet nowhere in its argument on this issue does it cite any page of the record in support of this statement that it had such knowledge when the repossession decision was made. Good faith cannot be created retroactively. The circumstances before the trial court were sufficient to point to an absence of good faith. Furthermore, the bank has given us no case law to support its position on this issue.

(ii)

The bank secondly argues that the prospect of payment was impaired. The bank asserts that Norris was financially unable to meet his obligation to pay for the trailer and that this justified the decision to accelerate and repossess. The trial court, however, had before it evidence sufficient to show lack of good faith by the bank with respect to this alleged basis for the repossession. John Runk, the bank's own employee, supplied this evidence. He testified in deposition evidence that when Van Bibber first called him on November 9, he asked Runk whether Norris was "current" on his account. Runk told Van Bibber that the account was current. Here was evidence before the trial court to rebut a claim by the bank that it repossessed due to the "fragile" finances of Norris. Of course, the mere fact that Runk told Van Bibber the account was current may not in every case defeat the bank's claim of insecurity. It is nonetheless an important circumstance upon which the trial court may rely to find lack of good faith by the bank.

 Many of the other factors asserted by the bank to justify its contention of insecurity are, once again, factors conceived in hindsight. The bank asserts that the legal defense costs of Norris following his arrest, the stigma of being labeled a pusher, the fact that Norris had to pawn some personal property to raise bail, his low level of income, the expense of bond premiums, the fact that Norris was in jail from November 9 to December 11, etc., justify a conclusion of insecurity. Here as elsewhere the bank tries to justify its "good faith" of November 9 on the basis of circumstances many of which occurred after November 9. Thus these circumstances could not have entered into the bank's decision to repossess. For instance, the fact that Norris had to pawn some personal property in order to raise bail could not have been known to the bank on November 9. In any event, the bank again fails to cite any part of the record to support a contention that these factors entered into its decision to repossess. At best, the deposition testimony of Runk discloses that, with respect to the

alleged ground of insecurity,[6] the bank knew only that Norris was in jail. Obviously an incarcerated debtor would be a cause of concern for the secured party. In some instances it may justifiably be a basis for insecurity. We are supplied with no case law on this. On the other extreme, we are not prepared to hold, as the bank apparently urges, that incarceration of a debtor would in every and any instance *ipso facto* justify a claim of insecurity absent any further investigation of the incident, of the likelihood of the debtor's conviction or acquittal,[7] and whether it was likely that imprisonment would follow. If secured parties would be automatically justified to repossess upon first word that the debtor had been arrested and detained in jail, then conceivably many adequately secured debts would needlessly be foreclosed. This makes little sense. We find no error in the judgment.

### (iii)

 As a third basis for insecurity the bank points to what it calls non-performance by Norris. The thrust of this argument is not entirely clear. Nor, as we explain below, does the bank adequately explain how this argument leads inevitably to a conclusion that the judgment should be reversed. This argument is directed at conclusion of law no. 7. Here the trial court held that the bank did not in good faith believe the loan was insecure. The bank also directs attention to finding of fact no. 5. There the trial court listed certain factors upon which the trial court arguably relied to find an absence of good faith. This list included such items as the fact that the October 30 payment was not more than ten days overdue; that Norris had paid approximately 70% of the purchase price; that the value of the collateral exceeded the balance due on the contract; that the bank was protected against financial loss by the repurchase agreement with Van Bibber; and so forth.

In this particular argument the bank questions the truth of some of the above factors. More directly, however, the bank's attack appears to be that (1) at least some of the factors were improper elements upon which to base a determination of the presence or absence of good faith; (2) that the trial court gave improper weight to some of the factors; and (3) that it is possible to place a construction or interpretation upon the circumstances giving rise to this lawsuit in a light more favorable to the bank than was adopted by the trial court.[8]

Whether or not the bank had good faith to believe itself insecure calls for a factual inquiry by the trial court. In a given case innumerable considerations may enter into the trial court's decision. We will not attempt at the appellate level to circumscribe the court's inquiry. The role which the various factors played and their weight is a matter for the court. Essentially the bank

---

**6.** Runk testified that, "I told him [Van Bibber] we decided to repossess due to the [newspaper] article we had seen, and the past payment record of the customer, and the fact that we felt that with what had happened, that he would not have income sufficient to do this, and we would, we were just going to have the unit picked up." Record 608. The "past payment record" was dealt with in an earlier portion of this opinion.

**7.** As it turns out, the record indicates that Norris was convicted.

**8.** The second and third components of the bank's argument would have us ignore the traditional standards of appellate review. We can dispose of these components by pointing out that we view the evidence in a light favorable to the judgment, *Kroger Co. v. Beck*, (1978) Ind.App., 375 N.E.2d 640, 643, we cannot re-

weigh the evidence, *Department of Commerce v. Glick*, (1978) Ind.App., 372 N.E.2d 479, 481, the determination of the trier of fact will be upheld if supported by any substantial evidence of probative value, *State Farm Mut. Auto Ins. Co. v. Shuman*, (1977) Ind.App., 370 N.E.2d 941, 956, when the evidence supports conflicting inferences we cannot substitute our judgment for that of the trial court, *Lucus v. Richardson*, (1975) 167 Ind.App. 210, 338 N.E.2d 659, 662, it is not our role to resolve conflicts in the evidence, *Childs v. Rayburn*, (1976) Ind. App., 346 N.E.2d 655, 664, and we may presume that the trial court reached the correct result, *Souerdike v. State*, (1952) 231 Ind. 204, 108 N.E.2d 136, 137; *C. A. Enterprises, Inc. v. Employers Commercial Un. Ins. Co. of America*, (1978) Ind.App., 376 N.E.2d 534, 537.

is encouraging us to devalue those factors adverse to the bank's position and to inflate those factors favorable to its position. This however is a factual determination for a trial court. We cannot reweigh evidence to assign different values to those factors bearing upon good faith and insecurity. There was sufficient evidence upon which a trial court reasonably could conclude that Norris had proved lack of good faith on the part of the bank.

Nonetheless to assure the bank that we have considered its position, we address the more important issues it has advanced.

■ The bank asserts that by virtue of Van Bibber's repurchase agreement he was a surety for the debt of Norris. Consequently the bank contends that under principles of suretyship law it could not allow Norris to deviate from the payment schedule. Any deviation, argues the bank, could discharge Van Bibber from his suretyship obligation.

This is not true. The bank's argument overlooks the repurchase agreement it had imposed on Van Bibber. The repurchase obligation of Van Bibber was contained on the bank's form security agreement. As part of that obligation the bank had Van Bibber waive the suretyship defense of timely performance by Norris. Thus we find no merit in the bank's argument. The suretyship waiver is found in that language of the repurchase agreement which states that Van Bibber "will so purchase the Goods although the Bank has, prior thereto, and without Dealer's [Van Bibber's] consent waived default by the Buyer in the performance of the Agreement or has granted an extension of time to the Buyer in which to perform . . . ." In view of this the bank's fear of a possible suretyship discharge is unfounded.

Second, the bank argues that finding of fact no. 5 "indicates" the trial court imposed upon the bank a duty to demonstrate there was no possibility of payment. We do not discover any such indication in the finding.

The bank argues that it is irrelevant that Norris was only ten days overdue. This matter certainly was relevant. Runk had testified that thirty-seven other times Norris was ten days overdue. This finding therefore may reasonably reflect a trial court's skepticism that the bank was insecure on November 9. This is especially true when Runk had said the account was "current."

The bank attacks the trial court's finding that Norris had paid approximately 70% of the purchase price and that the value of the collateral exceeded the balance due. This would have at least some bearing on insecurity. Certainly the fact that the trial court mentioned these matters in his judgment would not be sufficient reason to reverse.

The trial court found that Norris was entitled to release on bail pending trial. The bank complains that this is a hindsight observation. It is not. The trial court at this point was not concerned either with hindsight or foresight. The trial court's mention of bail was made within the context that when a secured party learns of a debtor's detention, one factor which the secured party reasonably could assess when reviewing the security of the debt is the possibility of the debtor's release on bail.

The bank argues there was no evidence that it knew or should have known that the trailer was worth more than the amount of the debt. The bank misses the point. This factor was simply another matter which the secured party reasonably could assess when reviewing the security of the debt. The failure of the bank to make this assessment was one element of the trial court's determination—weighed with all the other facts and circumstances of this case—to reach a judgment that the bank did not act in good faith.

In conclusion, we cannot reweigh the many items of evidence to determine whether the bank had acted in good faith. *Department of Commerce v. Glick*, (1978) Ind.App., 372 N.E.2d 479, 481. The bank is urging is to depart from the appellate function to review questions of law and to dis-

place the trial court function of weighing evidence. This is illustrated by the circumstance that for the most part it cites not a single case law precedent upon which to base its conclusion that its view of the evidence is the only reasonable one.

### (iv)

The bank directs our attention to conclusion of law no. 8. This conclusion states that the bank "did not act in a reasonable manner or as a 'reasonable man' would act, given the same set of facts or circumstances." The bank argues that a better phrasing of the trial court's standard would be: "Has Norris proven that a reasonable man motivated by good faith under the same set of facts and circumstances would not have concluded that the prospect of payment or performance by Norris had been impaired."

The gist of the bank's argument appears to be as follows. The bank argues that conclusion of law no. 8 indicates that the trial court's standard placed too much focus on the objective aspects of the bank's behavior. The bank argues that its formulation of the standard incorporates the appropriate proportions of objectivity and subjectivity. *See Universal C.I.T. Credit Corp. v. Shepler*, (1975) 164 Ind.App. 516, 329 N.E.2d 620. We make several observations concerning the bank's argument.

First, we do not believe that the particular manner in which the court worded conclusion no. 8 should be construed to mean that he necessarily ruled out all considerations of subjectivity. This conclusion no. 8 could just as well be read for the proposition that insofar as the determination of good faith depends upon certain objective determinations, the trial court has resolved that component of good faith against the bank. The fact that, as worded, this particular conclusion does not emphasize the subjective component of good faith should not be interpreted by the bank to mean that the court necessarily ruled out all considerations of subjectivity. Other portions of the judgment focus on subjectivity. For instance, in conclusion no. 6 the court held that the bank had not made a diligent and honest effort to discover that the security was impaired. This determination of diligence and honesty called for a subjective inquiry by the trial court.

Second, on appeal all presumptions are in favor of upholding the trial court's judgment. *Indiana Broadcasting Corp. v. Star Stations*, (1979) Ind.App., 388 N.E.2d 568, 573. We have a duty to construe the judgment to sustain its validity. "In construing a decree it is the duty of this court, if possible, to give it that construction which sustains its validity." *Local Un. No. 135 v. Merchandise Warehouse Co.*, (1959) 240 Ind. 153, 159 N.E.2d 388, 390. " 'Judgments should be liberally construed so as to make them serviceable instead of useless.' " *Ayres v. Smith*, (1949) 227 Ind. 82, 84 N.E.2d 185, 190. Conclusion no. 8 can readily be construed in a manner consistent with the balance of the judgment as explained in the preceding paragraph.

Third, the bank complains that in conclusion of law no. 8 the court relied upon hindsight. We do not see how the bank arrives at this result. We also believe it curious that the bank chastizes the court for having relied upon hindsight when much of the bank's argument is hindsight also.

### III.

The bank argues that it had no duty to give Norris an opportunity to redeem or to give notice of the acceleration, repossession, and eventual repurchase by Van Bibber. The bank cites *Weaver v. O'Meara Motor Co.*, (1969) Alaska, 452 P.2d 87, 92. And, in fact, the court found that the bank had given no such notice or opportunity to redeem. These determinations are contained in findings no. 12 and 14–18. The bank does not directly attack the truth of these findings. Rather the bank chiefly argues that by having made these negative findings the court had impliedly found that the bank had an affirmative obligation to give notice. The bank contends that the court had imposed liability on the bank for failure to give such notice or opportunity to redeem. We disagree.

In an earlier portion of this opinion we held that there was an adequate basis upon which to affirm the judgment. Having reached this conclusion we will not now reverse based upon arguments which exist, if at all, only by implication. We cannot indulge in an implication which is adverse to judgment. 5 C.J.S. *Appeal & Error* § 1564, pp. 1310–11 (1958). Furthermore the bank's argument overlooks our duty to construe the judgment to sustain its validity. *Local Un. No. 135 v. Merchandise Warehouse Co.*, (1959) 240 Ind. 153, 159 N.E.2d 388, 390. The bank's invitation for us to reverse on the basis of an implication is nothing but an invitation to construe the judgment to destroy its validity. We also note that nowhere in the judgment has the trial court stated that the bank's liability was keyed to a failure to give notice or an opportunity to redeem to Norris. For these reasons the bank's argument of liability by implication too far twists the fabric of the judgment.

### IV.

The trial court awarded damages for loss of the trailer and its contents. Assuming *arguendo* the acceleration and repossession were wrongful, the bank argues that its conduct did not proximately cause the loss.

The bank's analysis of the judgment in this particular argument does not include any attempt to identify the potential legal theories on which the judgment is based. One such theory would be conversion. "The legal wrong denominated 'conversion' is any unauthorized act of dominion or ownership exercised by one person over personal property belonging to another in denial of, or inconsistent with, his right." 89 C.J.S. *Trover & Conversion* § 1 (1955). The court's conclusion no. 11 tracks this statement with the following language: "That defendants exercised unauthorized dominion and wrongful control over the property of the plaintiff which subsequently led to its total loss by fire." The exercise of dominion over the property of another constitutes a conversion. *Gordon v. Stockdale*, (1883) 89 Ind. 240, 245. Conclusions no. 13 and 14

also refer to the "wrongful seizing" of the trailer and its contents, and to the "unlawful repossession" of the trailer.

It is accepted law that a wrongful repossession may be a conversion. "A chattel mortgagee or conditional sale vendor commits a conversion if he seizes the chattel before he is entitled to its possession under the terms of the mortgage or conditional sale . . . ." 1 F. Harper & F. James, Jr. Law of Torts § 2.30 (1956). Conversion is an intentional tort, *Id.* § 2.10, but the law carefully observes that liability is not dependent upon the subjective mental intent or good faith of the defendant. 18 Am. Jur.2d *Conversion* § 7 (1965). "Conversion is a continuing tort, lasting as long as the person entitled to the use and possession of his property is deprived of it. It does not necessarily end when the original wrongdoer transfers physical possession to another." 18 Am.Jur.2d *Conversion* § 1 (1965).

The bank argues that its conduct created at best merely a condition. The bank then points to Van Bibber. It labels him an independent intervening agency. The bank also refers to some principal-agent concepts. It concedes that it had authorized Van Bibber to repossess the trailer but it contends that he acted outside the scope of his authority. The net result of the bank's position is that the loss of the trailer and its contents occurred after the repurchase by Van Bibber. Thus, to employ the bank's terminology, the decision to accelerate and repossess was not the "proximate cause" of the damage.

This "proximate cause" argument fails because conversion is an *intentional* tort. 1 F. Harper & F. James, Jr., Law of Torts § 2.10 (1956), *supra*. Proximate cause, however, falls chiefly within that body of tort law covering liability for *negligence*. Speaking generally it is true that a defendant is not liable in tort unless his conduct is the "legal cause" of the injury, Restatement (Second) of Torts § 9, Comment a (1965), and this sometimes is loosely called proximate cause. However, the particular concept of "proximate cause" does not apply to the intentional tort of conver-

sion. A review of almost any test or treatise on torts reveals that proximate cause is usually not included as an element of conversion. *See e. g.*, W. Prosser, *The Nature of Conversion*, 42 Cornell L.Q. 168 (1957); W. Prosser, Law of Torts 79–97 (4th ed. 1971). It is generally not treated as an element of the intentional tort of conversion. The bank cites no authority that proximate cause is an element of conversion.[9]

Viewing the bank's conduct as a conversion, 1 F. Harper & F. James, Jr., Law of Torts § 2.30 (1956), *supra*, liability therefor was complete on November 20, 1970. This was when Van Bibber repossessed the trailer and its contents. Van Bibber carried this out at the bank's behest and at a time when the bank concedes that it had authorized him to repossess the trailer. In light of all this we find no merit in the bank's "proximate cause" argument. Damages for conversion are the value of the goods at the time of the conversion. What subsequently becomes of the goods is irrelevant. Furthermore, acceptance of the bank's argument would insulate any secured party from a lawsuit for conversion so long as the secured party promptly disposed of the collateral through a repurchase agreement.

As an extension of the above argument the bank has contended that Van Bibber's subsequent conduct made him solely liable for the damages to Norris. This requires but a short answer. That another party also participated in the wrongdoing does not excuse other tortfeasors such as the bank.

We have found no error in the trial court's decision to impose liability on the bank.[10] We turn to the liability of Van Bibber.

## V.

The court rendered judgment against Virgil Van Bibber and the Van Bibber Lakeside Retreat, Inc. We referred to these two entities as "Van Bibber" for our preceding discussion of the bank's liability. See footnote no. 1, *supra*. The brief filed on behalf of the individual Van Bibber and the Van Bibber corporation introduces a third Van Bibber entity. This is the Van Bibber partnership known as Van Bibber Lakeside Retreat.

The Van Bibber brief poses separate arguments on behalf of Van Bibber the individual and Van Bibber the corporation. We have difficulty following the arguments. The Van Bibbers fail to apply the law to the facts to produce an argument sufficient to demonstrate reversible error. "Certainly the obligation of an appellate attorney goes beyond the making of bare assertions, leaving the court to its own devices to ascertain the precise nature of the contentions made and the law, if any, applicable thereto." *Dortch v. Lugar*, (1971) 255 Ind. 545, 266 N.E.2d 25, 51.

The gist of the argument appears to be an evidentiary challenge to the judgment. Namely, three distinct Van Bibber entities participated in this controversy but Norris failed to establish any link between them or the liability of any particular one of them. For example, the Van Bibbers argue that the repurchase agreement was between the bank and the partnership.[11] They argue[12] that the partnership carried out the repos-

---

9. *Grande v. General Motors Corp.*, (7th Cir. 1971) 444 F.2d 1022, 1027, cited by the bank in another portion of its argument, discusses proximate cause and conversion. That case cannot support a conclusion that proximate cause is an element of conversion. It is distinguishable because the defendant was charged with having encouraged *others* to convert the plaintiff's goods.

10. The bank's reply brief questions whether the bank is excused from liability for failure of Norris to seek immediate recovery of his property under IC 34–1–8–1—2, and for failure of

Norris to seek a restraining order against Norris. This issue was not discussed in the bank's initial brief and the bank has waived this question. "It is well settled in appellate practice that questions not raised or discussed in appellant's original brief cannot be presented in appellant's reply brief." *State v. Marion Circuit Court*, (1958) 238 Ind. 637, 153 N.E.2d 327, 330.

11. Brief 73.

12. Brief 73, 75, 90.

session and that the individual Van Bibber did not.[13] However, they contend, the actual sale of the trailer following the repossession was a transaction between the bank and the corporation.[14] Immediately some defects surface in this argument.

First, the Van Bibber defendants make no adequate showing, with appropriate references to the record, that they ever disclosed their theory of defense (if it can be called that) to the trial court. In addition the findings and conclusions tendered by the Van Bibber defendants make no disclosure that their liability should be defeated for failure of Norris to attribute a wrongful act to a particular Van Bibber. They requested no findings upon the failure of Norris to establish any relation between the various Van Bibbers. This failure indicates to some extent that the Van Bibbers conceived their defense belatedly. This particular defense of the Van Bibbers did not first appear, so far as the record reveals, until they filed a motion to correct errors.

▆▆▆ Generally speaking, a defendant has the burden to put his defense in issue. *Rogers v. State*, (1978) 267 Ind. 654, 373 N.E.2d 125, 127. A defendant can do this by presenting the appropriate pleadings and evidence. *Id.*; *see* Ind.Rules of Procedure, Trial Rule 8(C). The Van Bibber defendants cannot overthrow the judgment on the basis of an argument or issue which they never clearly disclosed to the trial court. *Health & Hospital Corp. of Marion Cnty. v. Gaither*, (1979) Ind., 397 N.E.2d 589, 593; *Dunn v. Jenkins*, (1978) Ind., 377 N.E.2d 868, 877; *Indiana Aeronautics Comm'n v. Ambassadair, Inc.*, (1977) 267 Ind. 137, 368 N.E.2d 1340, 1347. This discussion points out that the Van Bibbers have raised this argument for the first time in their motion to correct errors. This is too late. *Jacks v. State*, (1979) Ind., 394 N.E.2d 166, 173;

*Johnson v. State*, (1979) Ind., 390 N.E.2d 1005, 1009. Because the argument on issue was not raised until after trial the Van Bibbers waived it.

The Van Bibbers committed a second major error. Their attack on the judgment in the motion to correct errors differs in several substantial respects from the attack made on appeal. In the motion to correct errors they contended that, apparently, the individual Van Bibber and the corporate Van Bibber carried out the repossession.[15] On appeal they deviate and contend that the *partnership* carried out the repossession[16] and that, apparently, the individual "Van Bibber" did not.[17] In the motion to correct errors they argue that the corporate and the individual Van Bibber purchased the trailer from the bank.[18] On appeal they mention only the corporation as the purchaser.[19] As a final example of deviation the motion to correct errors states that the individual and corporate Van Bibbers were agents of the bank in carrying out the repossession.[20] On appeal the argument is switched and they contend that the partnership was the agent.[21]

▆▆▆ All of this is sufficient to show that the Van Bibbers advance at the appellate level arguments substantially different than those found in the motion to correct errors. However, we review the judgment only on the basis of those contentions assigned in the motion to correct errors. *Udchitz v. State*, (1979) Ind.App., 398 N.E.2d 688, 689–90 n. 3; *Johnson v. Wabash Cnty.*, (1979) Ind.App., 391 N.E.2d 1139, 1144; *Brummett v. Pilatte*, (1979) Ind.App., 390 N.E.2d 705, 709; *Libunao v. Libunao*, (1979) Ind.App., 388 N.E.2d 574, 578.

The Van Bibber argument contains a third defect. Within their appellate brief they fail to be consistent with the various

13. Brief 92, 94, 97.

14. Brief 73, 81, 82, 87, 92, 95.

15. Record 51–52, 62, 63, 64, 68, 70.

16. Brief 73, 75, 90.

17. Brief 92, 94, 97.

18. Record 52, 57, 73.

19. Brief 73, 81, 82, 87, 92, 95.

20. Record 56, 61, 63.

21. Brief 90.

roles played by the three different Van Bibbers. The Van Bibbers argue on p. 90 that "Van Bibber" was "merely a surety" for Norris. In the very next sentence they argue that "Van Bibber" as an individual was *not* a surety. These side-by-side contradictions demonstrate the poverty of the Van Bibbers' arguments. They make other contradictions. The Van Bibbers state that the Van Bibber partnership repossessed the trailer.[22] In contrast the appellants elsewhere said only that "Van Bibber" repossessed.[23] At one place they designate the partnership as the bank's agent.[24] At a second place the brief labels "Van Bibber" the agent.[25] In sum, Van Bibber wears too many caps. The three Van Bibbers merge and diverge so often that their respective identities vanish. The brief forgets to inform us which particular Van Bibber is under discussion at several points in the argument. This omission prevents effective appellate review of most of their arguments.

The Van Bibbers do make a few arguments susceptible to appellate review. They argue that Norris had no right to maintain a cause of action in conversion. We answered this contention adversely to the Van Bibbers in our discussion of the bank's liability.

■ The Van Bibbers contend that the transfer of the trailer from the bank to the Van Bibber corporation was a private sale. They argue this transaction terminated any claim or interest by Norris in the trailer. The Van Bibbers err. Viewing the proceedings in a light favorable to the judgment, the transaction between the bank and Van Bibber corporation was a "repurchase." IC 26–1–9–504(5). Thereafter the repurchaser (be it one Van Bibber or another) has the rights and duties of the secured party. *Id.* Norris had the right to redeem, IC 26–1–9–506, and any disposition of the collateral by the Van Bibbers had to be in a commercially reasonable manner. IC 26–1–9–504(3).

■ The Van Bibbers question their liability for the contents of the trailer. The contents consisted of household furnishings. The law imposed upon the Van Bibbers the duty to exercise reasonable care for the contents of the trailer. *Nevada Nat'l Bank v. Huff*, (1978) Nev., 582 P.2d 364; *Varela v. Wells Fargo Bank*, (1971) 15 Cal.App.3d 741, 93 Cal.Rptr. 428; *Southern Indus. Sav. Bank v. Greene*, (1969) Fla.App., 224 So.2d 416. The Van Bibbers, having assumed the obligations of a secured party, IC 26–1–9–504(5), may be deemed a constructive bailee with respect to the contents of the trailer. *Southern Indus. Sav. Bank v. Greene, supra.*

■ As a bailee Van Bibbers' duty was to preserve the contents of the trailer. The contents disappeared either due to the fire or because Van Bibber gave them away. The law of bailments placed upon the Van Bibbers the duty to explain the loss of the goods and the duty to show lack of negligence. *General Grain, Inc. v. International Harvester Co.*, (1968) 142 Ind.App. 12, 232 N.E.2d 616; *Jones v. Sommers*, (1966) 140 Ind.App. 459, 215 N.E.2d 871; *Keenan Hotel Co. v. Funk*, (1931) 93 Ind.App. 677, 177 N.E. 364, 365–66 (bailee's excuse that goods were burned, destroyed, or stolen does not satisfy bailee's duty to prove his absence of fault). We need not delve too far into the law of bailments because the Van Bibbers refused to acknowledge in the first instance any duty whatsoever toward the contents. Consequently, because we presume the judgment is correct, *Souerdike v. State*, (1952) 231 Ind. 204, 108 N.E.2d 136, 137, and in light of our obligation to view the evidence in a manner favorable to the judgment, *Kroger Co. v. Beck*, (1978) Ind.App., 375 N.E.2d 640, 643, we are satisfied to affirm the trial court's conclusion that the Van Bibbers are liable for the contents.

The evidence and the law support the trial court's imposition of liability on the Van Bibbers. We now discuss damages.

---

22. Brief 73, 90, 92.

23. Brief 94, 96.

24. Brief 90.

25. Brief 96.

## VI.

The bank challenges the award of punitive damages. It first claims the trial court erred in making this award because the court found a conspiracy when in fact there was none. We earlier pointed out that the court never found a conspiracy. See Section I, *supra*. Moreover, the bank does not explain how the presence or absence of a conspiracy affects liability for punitive damages. The bank's reliance on the conspiracy argument is an attempt by the bank to overthrow the judgment on the basis of an imaginary issue. We need not address it.

The bank also complains that the award of punitive damages is reversible error because the award resulted from the court's erroneous imposition of certain duties of notice upon the bank. In Section III, *supra*, we disagreed as to this "notice" argument. We noted that this argument could be made only by reading the judgment to destroy its validity. Accordingly we rejected this argument and we need not entertain it again.

The bank next argues that Norris sued for breach of contract. Consequently, the bank contends, the trial court could award punitive damages only if the bank's conduct amounted to an independent tort. See, e. g., *Murphy Auto Sales, Inc. v. Coomer*, (1953) 123 Ind.App. 709, 112 N.E.2d 589.

The bank accurately points out that Norris' pleadings allege a breach of contract. However, we reject the contention that in this lawsuit Norris seeks to recover simply for breach of contract. To call Norris' injury solely a breach of contract is to ignore the actual proceedings and evidence at trial. Following the trial the court could award Norris the relief justified by the evidence and the law. " 'Neither pleadings, pre-trial orders, or "theories" postulated by either party should then operate to frustrate the trier of fact in finding the facts which that evidence (including all reasonable inferences the trier may draw therefrom) convinces him (whether he be a judge or juror), by a preponderance thereof, is true or block him from awarding the relief, if any, which the rules of substantive law say those facts merit.' " *Ayr-Way Stores, Inc. v. Chitwood*, (1973) 261 Ind. 86, 300 N.E.2d 335, 340 (emphasis deleted).[26] The bank would also ignore the remedy provided for wrongful repossession. For this injury the law provides the action of conversion. "A chattel mortgagee or conditional sale vendor commits a conversion if he seizes the chattel before he is entitled to its possession under the terms of the mortgage or conditional sale . . ." 1 F. Harper & F. James, Jr., Law of Torts § 2.30 (1956); see *Ford Motor Credit Co. v. Byrd*, (1977) Ala., 351 So.2d 557, 560 (wrongful repossession treated as a conversion). We held in an earlier portion of this opinion that the decision of the trial court may reasonably be viewed as having imposed liability on the bank for the tort of conversion. Thus we are not forced to view the award of punitive damages solely as resulting from a breach of contract. In any event the bank's conduct was sufficiently egregious to result in liability for punitive damages regardless whether this appeal is viewed as arising from a suit in contract or tort.

We briefly review those characteristics of the bank's conduct which justify the award of punitive damages. In making this review we cannot reweigh the evidence nor judge the credibility of witnesses. *Travelers Indem. Co. v. Armstrong*, (1979) Ind. App., 384 N.E.2d 607, 618. Where the evidence is in conflict we will accept that version favorable to the judgment.

---

**26.** The bank obviously viewed this lawsuit as one based on conversion. For instance, following the plaintiff's case, the defendants moved for a dismissal and judgment. Counsel for each defendant, including the bank, specifically referred to "conversion." The bank's written motion addressed Norris' "claim for conversion against AFNB." At one point during the ensuing discussion the judge commented without contradiction or correction, "It's your [Norris'] contention, by this portion of argument then is that AFNB by repossession converted the personal property, is that correct?" Finally, the bank encouraged the trial court to view the lawsuit as an action for conversion. In the bank's proposed conclusion of law no. 4 the bank referred to "Norris' claim based on conversion."

On November 9, 1970, the bank decided to accelerate and repossess. At that time it knew that Norris had tried to remove the trailer from Imperial Estates. It also knew that law officers had arrested Norris and placed him in jail. On information as scant as this the bank chose to take away his home. The bank's contractual agreements with Norris and Van Bibber placed the bank in a position of great financial security. The bank could look to Norris for payment of the debt. On the other hand, if Norris ever were unable to pay, the bank had an iron-clad repurchase agreement (including waiver of suretyship defenses) with Van Bibber. Of course, there was nothing wrong with the bank having obtained the repurchase agreement. We mention it only to point out that the contract guaranteed against almost any loss. The contract certainly guaranteed the bank against loss in this particular case. A trial court reasonably could infer that this degree of financial security should have promoted caution on the part of the bank before deciding to accelerate and repossess. That on fifty-seven prior occasions the bank had accepted past due or delinquent payments yet had not accelerated or repossessed may illustrate the degree of financial security possessed by the bank. Conversely, on November 9, Runk said Norris was "current" yet the bank decided to repossess.

The evidence favorable to the judgment would support reasonable inference that in reality the bank decided to repossess at barely nothing more than the urging of a disgruntled Van Bibber. Remember that Van Bibber's first question to Runk was whether Norris was current on his account. Only after receiving an affirmative response did Van Bibber relate the weekend incident at Imperial Estates. The trial court could reasonably infer that upon receiving Van Bibber's telephone call about the incident at Imperial Estates, and upon Runk's coincidental notice of the arrest in the newspaper the bank threw caution to the wind and figured they now had the chance to appease Van Bibber.

The bank's attempt to sustain its decision on the basis of post-November 9 circumstances only emphasizes the meagerness of its justification for the decision. The bank has erroneously referred to the action of the Montgomery Circuit Court as an impoundment when, in fact, that court only maintained the status quo. The bank mentions the difficulty Norris had making bail. This certainly was not known to the bank on November 9. The bank made no effort (prior to deciding to repossess) to determine the potential merit of the lawsuit in the Montgomery Circuit Court. The bank made no investigation to determine the potential merit of the criminal charges following the arrest of Norris. Noticeable in all of this is the bank's failure to present case law to support its conduct. That such case law is lacking in the bank's briefs or that the bank's asserted justification is of little merit supplies no ground on which to affirm the award. We mention this only to illustrate that the bank's conduct is apparently unprecedented.

■ Punitive damages may be appropriate when goods are wrongfully taken. *Ohio Finance Co. v. Berry*, (1941) 219 Ind. 94, 37 N.E.2d 2, 3 (award of $1300 upheld for goods valued at $200); *Nevada Nat'l Bank v. Huff*, (1978) Nev., 582 P.2d 364, 370–71; *Lee v. Wood Prods. Credit Un.*, (1976) 275 Or. 445, 551 P.2d 446. Viewing the evidence in a light favorable to the judgment we hold that the trial court reasonably could conclude that punitive damages were appropriate.

■ Lastly the bank argues against punitive damages for the reason that its behavior was punishable as a theft. This argument finds authority in the Indiana rule that such damages cannot be awarded if the defendant is amenable to criminal prosecution. *Taber v. Hutson*, (1854) 5 Ind. 322. The bank directs our attention to IC 35–17–5–3 and IC 35–17–5–8 (both now repealed). The first statute made theft a crime. The second statute also was effective at the time material to this lawsuit. It read as follows:

Interest in property—Effect.—(1) Generally. It is no defense to a charge of

theft that the actor has an interest therein, when the owner also has an interest to which the actor is not entitled, except as provided herein. (2) Owner of encumbered property. An owner in possession of encumbered property does not commit theft as against a person having only a security interest therein by removing or otherwise dealing with the property contrary to the terms of the security agreement, even if title is in the creditor pursuant to mortgage, conditional sales contract or bailment lease.

The bank argues that its conduct would be a theft, IC 35–17–5–3, and that the bank would be liable notwithstanding its security interest, IC 35–17–5–8(1).

This argument fails. In Indiana punitive damages may be recovered for the wrongful taking of property. *Ohio Finance Co. v. Berry*, (1941) 219 Ind. 94, 37 N.E.2d 2, 3; *Jerry Alderman Ford Sales, Inc. v. Bailey*, (1973) 154 Ind.App. 632, 294 N.E.2d 617, 618; *Monarch Buick Co. v. Kennedy*, (1965) 138 Ind.App. 1, 209 N.E.2d 922, 924. Justice Hunter speaking for the Appellate Court has said, "we hold that in an action in tortious conversion, punitive damages may be alleged and such were properly requested in the instant case." *Monarch Buick Co. v. Kennedy, supra*, 209 N.E.2d 924.

Second, liability for theft under IC 35–17–5–3 is possible only when the bank intends to deprive Norris permanently of his property. IC 35–17–5–3(2); *Tuggle v. State*, (1969) 253 Ind. 279, 252 N.E.2d 796, 799; *Miller v. State*, (1968) 250 Ind. 338, 236 N.E.2d 173. However that intent is absent where the bank has attempted to repossess under the UCC. While the decision to repossess was wrongful, the UCC procedures initiated by the bank would, if carried out properly, preserve and restore to Norris any interest of his in the goods. This would be accomplished through his opportunity to re-

deem, IC 26–1–9–506, or by applying the proceeds of the disposition of the collateral to the debt, IC 26–1–9–504(1), or by the bank retaining the collateral in satisfaction of the obligation, IC 26–1–9–505(2). The net result of this is that criminal liability would not follow because the bank's repossession would restore to the bank only that which rightfully belonged to it.[27] *First Nat'l Bank & Trust v. State*, (1977) 141 Ga.App. 471, 233 S.E.2d 861 (bank not liable for theft where it had no intent to deprive).

Third, the bank's fear of criminal liability is unfounded because the legislature has expressly permitted secured parties to repossess. IC 26–1–9–503.

Fourth, under the bank's analysis even a repossession decision rightfully made would be a theft. This is because IC 35–17–5–8(1) would have held the secured party liable for theft whenever it repossessed property in which the debtor had an interest to which the secured party was not entitled. The bank could make the same argument under current law, see IC 35–43–4–1—5 (Burns Code Ed., Repl.1979). We are not prepared to adopt a rule that would make secured parties criminally liable even for repossession decisions rightfully made.

We have found no error in the assessment of punitive damages against the bank.

## VII.

Van Bibber attacks the award of punitive damages on several grounds. These include (1) Van Bibber's amenability to criminal prosecution bars such an award; and (2) Norris sued for breach of contract and punitive damages are unavailable except for conduct amounting to an independent tort. We refer Van Bibber to the comment of Justice Hunter in *Monarch Buick Co. v. Kennedy, supra*, and to our preceding discussion where we rejected identical arguments made by the bank.

27. We distinguish *Moore v. Waitt*, (1973) 157 Ind.App. 1, 298 N.E.2d 456. In that case the court held that punitive damages were unavailable where the defendant has converted the plaintiff's money to the defendant's own use. In contrast the defendant bank in the case at hand, governed by the UCC and acting pursu-

ant to legislative authority, IC 26–1–9–503, intended only to recoup its own interest in the collateral and to protect the interest of Norris. Furthermore, application of *Moore v. Waitt* to the case at hand would be contrary to Justice Hunter's pronouncement in *Monarch Buick Co. v. Kennedy, supra*.

A third basis of Van Bibber's attack is that his conduct was not sufficiently egregious to justify an award of punitive damages.

The record discloses there was abundant ill-will between Van Bibber and Norris. Neither party fully explains its origin. Whatever its source, ill-will should have served as no motivation for Van Bibber to importune the repossession. Although there may be no direct evidence that Van Bibber specifically requested the bank to repossess, there were circumstances from which a trial court reasonably could infer that Van Bibber out of spite for Norris pressured the bank to repossess. The court could also reasonably infer that a direct result of this pressure was the bank's decision to repossess. Van Bibber called the bank on November 9 and first asked whether Norris was current on his account. After receiving an affirmative response Van Bibber recounted the weekend incident at Imperial Estates.

Van Bibber (and the bank) have emphasized and have gone to great lengths to stress their version of how the decision to repossess was made. Van Bibber has argued that the bank *alone* decided to repossess. (The bank made a similar argument in portions of its brief.) For authority Van Bibber cites a stipulation which states simply that the bank decided to repossess. The stipulation does not answer the question whether the bank made the decision alone or whether the bank reached it jointly with Van Bibber. Thus Van Bibber has failed to cite effective authority on what he has put forth as an integral part of his defense. Furthermore, Van Bibber erroneously would have this court view the stipulation in a light unfavorable to the judgment. But, on appeal we must view the stipulation in a light favorable to the judgment. *City of Hammond v. Drangmeister*, (1977) Ind. App., 364 N.E.2d 157, 159; *Anuszkiewicz v. Anuszkiewicz*, (1977) Ind.App., 360 N.E.2d 230, 231.

Runk and Van Bibber were the two individuals holding the most intimate knowledge of the circumstances leading up to the decision to repossess. That when confronted with a lawsuit they should profess their blamelessness would not bar the trial court from drawing a contrary inference from other circumstances and conclude that the repossession substantially resulted from Van Bibber's vendetta against Norris. On fifty-seven occasions the bank had been content not to accelerate or repossess despite the fact that Norris was past due or delinquent. Twice the bank gave Norris an extension on the loan. But on November 9, following a telephone call from Van Bibber and at a time when Runk acknowledged that Norris was current, the bank suddenly decided to repossess. For Van Bibber to argue that the trial court should only have concluded that Van Bibber's enmity played no role in this is to ignore that court's duty to assess credibility and weigh evidence. "The record before us discloses many facts and circumstances that the trial judge may have deemed sufficient to warrant a disbelief of the appellant's testimony. The appellant had a direct interest in the result of the suit." *McKee v. Mutual Life Ins. Co. of N. Y.*, (1943) 222 Ind. 10, 51 N.E.2d 474, 475. "'And even though an item of evidence is not expressly or directly denied or refuted, it does not necessarily stand as uncontradicted evidence, for the trier may disregard or disbelieve oral evidence if it is considered unreasonable or inconsistent with facts and circumstances shown by the other credible evidence in the case.'" *A. S. C. Corp. v. First Nat'l Bank of Elwood*, (1960) 241 Ind. 19, 167 N.E.2d 460, 463. "Of course the trier of facts cannot arbitrarily reject items of oral evidence but even though a particular item of evidence is not expressly or directly contradicted this does not prevent the trier from taking into consideration all of the other evidence including circumstances and surroundings that might in any way affect the weight or credibility of such evidence and the trier may disregard oral evidence if considered unreasonable or inconsistent with facts and circumstances shown by the other evidence in the case." *Wright v. Peabody Coal Co.*, (1948) 225 Ind. 679, 77 N.E.2d 116 119.

We hold that the trial court justifiably could conclude that Van Bibber's conduct was sufficiently egregious to warrant an award of punitive damages. To urge the bank wrongfully to repossess a man's home whereby it and the contents are lost is to urge the misuse of a powerful legal remedy. This the trial court rightfully could decide to punish.

Van Bibber's fourth attack upon the punitive damages award is to complain that it is out of proportion to the actual damages. Van Bibber cites only one case on this particular point, *Bangert v. Hubbard*, (1955) 127 Ind.App. 579, 126 N.E.2d 778, *trans. den.*, (1957) 237 Ind. 5, 143 N.E.2d 285. We question whether *Bangert v. Hubbard* remains a valid statement of the law. Landis, J., concurring in the denial of transfer to *Dwyer v. McClean*, (1961) 133 Ind.App. 454, 175 N.E.2d 50, *trans. den.*, (1962) 243 Ind. 108, 183 N.E.2d 204, 205, said that *Bangert v. Hubbard* has been "virtually overruled." In any event we observe that in *Bangert v. Hubbard* the Appellate Court did not set forth any unbending rule that punitive damages could not exceed a certain multiple of the actual damages. A better view of that case is simply that the punitive damage award should not be excessive.

Is a $30,000 penalty excessive for one who has played a material role in the loss of a man's home and his possessions? We do not think so. There is no doubt that Norris suffered actual damage. The fact of this damage is certain. Indiana precedent sustains the size of the award of punitive damages. *Ohio Finance Co. v. Berry*, (1941) 219 Ind. 94, 37 N.E.2d 2, 3 (loss of personal property valued at $200; damage award of $1300 upheld); *Lou Leventhal Auto Co. v. Munns*, (1975) 164 Ind.App. 368, 328 N.E.2d 734, 742 (action for wrongful replevin; $30 nominal award and $1500 punitive award upheld); *Richardson v. Scroggham*, (1974) 159 Ind.App. 400, 307 N.E.2d 80, 85 (conversion of growing crops; $2,500 compensatory and $7,000 punitive awards upheld); *Snider v. Lewis*, (1972) 150 Ind.App. 30, 276 N.E.2d 160, 173 (malicious prosecution; $15,000 compensatory and $75,000 punitive awards

upheld); *Murphy Auto Sales, Inc. v. Coomer*, (1953) 123 Ind.App. 709, 112 N.E.2d 589 (rescission of conditional sales contract; $700 compensatory and $1,600 punitive awards upheld).

We find no error in the award of punitive damages against Van Bibber.

## VIII.

The bank contests the award of compensatory damages. Our appellate review begins with the presumption that the trial court reached the correct result. *Souerdike v. State*, (1952) 231 Ind. 204, 108 N.E.2d 136, 137. "It is a well-established rule of law that on appeal we must presume that all rulings of the trial court are correct until the contrary is shown." *Bir v. Austin Co.*, (1960) 131 Ind.App. 580, 170 N.E.2d 248, 250. We cannot reverse unless the judgment is clearly erroneous. Ind.Rules of Procedure, Trial Rule 52(A).

Norris submitted into evidence a four-page, single-spaced list of the items of property he lost. Norris had placed two monetary values beside most of the items on the list. The lower value represented the original purchase price of the item. The higher value represented the replacement cost. With respect to this document the parties entered into the following stipulation:

"Your Honor, speaking on behalf of all of the defendants in the case, we will stipulate that plaintiffs Exhibit 2 actually reflects the testimony that Mr. Norris would give in response to questions regarding the original price paid for certain items and corresponding the replacement cost of those items, except for the three groups of items on page three. The first relates to possessions inherited from [his] father's estate, the second group regular personal possessions and the third is library of books."

The $15,000 compensatory damage award is substantially less than the damage attested to in the stipulated testimony of Norris. The trial court did not enter a finding on the value of each item in the list. Instead the court made two separate findings on damages. The court awarded $5,000 "for

the loss of the mobile home," and $10,000 "for the loss of the personal contents contained in said mobile home." Thus the court's compensatory damage award fell far short of the loss claimed by Norris.

The bank first attacks the $5,000 award for the trailer. The trailer cost $4,395 when purchased new and was five years old at the time of the conversion. There is evidence from the stipulated testimony that the replacement cost was $6,500. The bank attacks the judgment on the ground that Norris recovered an amount in excess of what the five-year old trailer cost when new.

■ Our review of the $5,000 award is limited by certain appellate standards. We have a duty to construe the judgment to make it serviceable instead of useless. *Ayres v. Smith*, (1949) 227 Ind. 82, 84 N.E.2d 185, 190. We may determine the meaning of the award by examining the record, the pleadings, and the findings. *Local Un. No. 135 v. Merchandise Warehouse Co.*, (1959) 240 Ind. 153, 159 N.E.2d 388, 390; *State ex rel. Booth v. Beck Jewelry Enterprises, Inc.*, (1942) 220 Ind. 276, 41 N.E.2d 622, 623; *Hanley v. Mason*, (1908) 42 Ind.App. 312, 85 N.E. 381, 384. Where the language of the judgment is susceptible to two constructions one of which is correct, we are obliged to adopt that construction. *In re Summers*, (1922) 79 Ind.App. 108, 137 N.E. 291, 293.

We have noted that the court's damage award for the loss of the numerous items of property was condensed into two findings. Viewing the record in a light favorable to these findings, it is reasonable to conclude that the $5,000 amount included not only the value of the trailer, but also incorporated recovery for certain items closely connected to the trailer. These would include a portion of the air conditioning equipment, the water conditioner, and the water heater. A reasonable view of the judgment is that the court assigned the amount of · $5,000 to represent the aggregate value of these items. This view is consistent with

the balance of the judgment. Therefore we are obliged to adopt it. The bank's attack on the $5,000 award was premised on the belief that it represented the trailer alone. As we have pointed out, this premise is not compatible with a reasonable view of the judgment. Thus the bank's argument fails. The award is also in line with the stipulated testimony of Norris. We find no error in the $5,000 award.

The bank also attacks the $10,000 award for the loss of the personal contents contained in the home.

■ The bank first claims that there was insufficient evidence to support the valuation. The bank particularly points to an absence of evidence concerning depreciation. For household items and wearing apparel the measure of damages is the value of the goods to the owner. *Anchor Stove & Furniture Co. v. Blackwood*, (1941) 109 Ind. App. 357, 35 N.E.2d 117, 119; *Aufderheide v. Fulk*, (1916) 64 Ind.App. 149, 112 N.E. 399, 400–02; Annot., 34 A.L.R.3d 816, 820 (1970). In making this determination the court may consider original cost, depreciation, and replacement cost. Annot., 34 A.L. R.3d 816, 821 (1970); 22 Am.Jur.2d *Damages* § 150 (1965); C. McCormick, Law of Damages 176–77 (1935). In this case the court had before it evidence of the original cost and the replacement cost. We noted earlier that the court's damage award fell far short of the stipulated testimony that the replacement cost (excluding the damages for the mobile home, discussed *supra* ) was in excess of $10,000.[28] Obviously the court disbelieved much of the stipulated testimony. Also, the trial court's reduction of the damages claimed by Norris reflects its awareness that household goods and personal items depreciate. The court reasonably took this into account. *See, e. g., Rafal v. Rafal*, (1964) 41 Del.Ch. 434, 198 A.2d 177 (to measure damages for loss of household goods, court utilized a one-third across the board discount from replacement value); *Gray v. Security Storage & Van*

---

28. Replacement cost was apparently designated by Norris in the stipulated testimony as

"total personal losses of possessions at today's market values."

*Co.*, (1946) La.App., 26 So.2d 399 (appellate review of damages for loss of household goods; appellate court amended damage award by reducing it one-third to account for depreciation).

■ The evidence of the original purchase price and the replacement cost would, if believed, have justified an award well in excess of $10,000. Consequently we will not reverse the award merely because the trial court did not disbelieve this evidence or did not depreciate the property to the extent desired by the bank. We therefore hold there was sufficient evidence to support the award of $10,000.

Lastly the bank claims error with respect to the valuation of certain antique items of property. These include a mohair carriage robe and the Norris family tree. Norris testified that the robe was valued at $500 to $600. The bank contends in its brief that it objected that Norris lacked the knowledge to testify to the value of an antique. The bank also claims there was no evidence of the value of the family tree. An expert testified that "grabbing a figure out of the sky" the family tree was worth $5,000.

We find no error with respect to the valuation of the antiques or with respect to the above two items in particular. First, we repeat that Norris had submitted a four-page, single-spaced list of items he had lost. Given these many items, and given the relatively small size of the damage award in comparison with the stipulated testimony of Norris on most of the items, the judgment reasonably could be sustained even excluding the antiques and the two contested items entirely. Thus there is an adequate basis to sustain the judgment even accepting the bank's arguments about the antiques, the robe, and the family tree. Because this view of the damage award sustains the judgment this view is one we must adopt.

■ We have a second reason to reject the bank's argument. The damage award was a lump sum covering numerous items of property. This being so, the bank presents an appellate court with an unattainable objective when the bank challenges only a small portion of the items which *may* have been reflected in the lump sum. This objective is beyond reach because as explained above we have no method to determine what value if any the court assigned to the individual items. In any event, on appeal we presume that the award of damages rested upon those allegations which were sustained by the evidence. *Oberlin v. Pyle*, (1943) 114 Ind.App. 21, 49 N.E.2d 970, 972. Also, when we determine whether to sustain an award of damages we review only the total amount awarded and not the individual components. *See Ohio & M. Ry. v. Judy*, (1889) 120 Ind. 397, 22 N.E. 252, 254. We have already held in an earlier portion of our discussion that the award is not excessive.

■ Third, the bank based a portion of its argument on the claim that it objected to the lack of foundation for Norris to testify to the value of the robe. The bank fails to cite the record to support this assertion. The bank has waived any error. *White v. Crow*, (1964) 245 Ind. 276, 198 N.E.2d 222, 228; A.R. 8.2(B)(5). "If reference is made to evidence, the admissibility of which is in dispute, citation shall be made to the pages of the transcript at which the evidence was identified, offered, and received or rejected." A.R. 8.2(B)(5). In addition our review of the record fails to uncover any such objection. The bank's brief is in error.[29]

We affirm the award of compensatory damages against the bank.

## IX.

The Van Bibber corporation and the individual Van Bibber challenge the award of compensatory damages.

29. The bank's reply brief questions the valuation of certain antique books. This issue was not discussed in the bank's initial brief and the bank has waived this question. "It is well settled in appellate practice that questions not raised or discussed in appellant's original brief cannot be presented in appellant's reply brief." *State v. Marion Circuit Court*, (1958) 238 Ind. 637, 153 N.E.2d 327, 330.

Most of their argument is a rehash of their contentions concerning liability. *See* Section V, *supra*. We again reject it for the same reasons earlier presented. The Van Bibbers continually commit a major error by inviting this court to view the evidence in a light unfavorable to the judgment. This error completely destroys their argument. The Van Bibbers also fail to cite the record or to supply any legal authority for crucial portions of their argument. Much of the argument is nothing but unsupported conclusions. For example, the Van Bibbers claim that "Van Bibber" acted in the sole capacity of an agent for the bank and that this agency was disclosed to Norris. Yet the Van Bibbers fail to prove that a disclosed or undisclosed agency has anything to do with this lawsuit either as a matter of fact or of law. The Van Bibbers have again failed to apply the applicable law, namely the UCC. This is waiver. A.R. 8.3(A)(7); *In re Kesler*, (1979) Ind., 397 N.E.2d 574, 576; *Kennedy v. State*, (1979) Ind., 393 N.E.2d 139, 143;

*Faught v. State*, (1979) Ind., 390 N.E.2d 1011, 1016. As a second illustration, the Van Bibbers argue that the bank had possession and control of the personal property until it was destroyed by fire. Again this argument is waived for lack of authority or reference to the record.

The Van Bibbers challenge the size of the compensatory damage award. We upheld the award against a challenge by the bank. We refer the Van Bibbers to that discussion.

Affirmed.

MILLER, P. J., and CHIPMAN, J., concur.